# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | | |
|---|---|---|
| **EMMITT ROSCOE, JR.,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 7:17CV00494 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **L. COLLINS, ET AL.,** | ) | By: James P. Jones |
| | ) | United States District Judge |
| Defendants. | ) | |

*Emmitt Roscoe, Jr., Pro Se Plaintiff; Margaret H. O'Shea, Office of the Attorney General of Virginia, Richmond, Virginia, for Defendants Collins, Scarberry, Brock, Sellers, Bentley, Farmer, Large, Meade, also referred to as Mead, Bray, Sykes, Payne (Childress), Sexton, Mullins, Hubbard, Sowards and Dr. Wyatt; and Nathan H. Schnetzler, FRITH ANDERSON+PEAKE, P.C., Roanoke, Virginia, for Defendant Dr. Boakye.*

The plaintiff, Emmitt Roscoe, Jr., a Virginia inmate proceeding pro se, filed this civil rights action under 42 U.S.C. § 1983. In his Second Amended Complaint ("Complaint"), he alleges that the defendants denied him prompt access to dental care for a broken jaw, provided meals he could not eat with his jaw wired shut, and denied him due process during disciplinary proceedings. Presently before me are separate motions for summary judgment by the defendants and Roscoe's responses thereto. After review of the record, I conclude that one defendant's motion must be granted and that the other defendants' motion must be granted in part and denied in part.

# I.  BACKGROUND.

The facts, where contested, are presented in the light most favorable to the plaintiff's version of those facts and are not intended to represent findings of the court.

While Roscoe was speaking to attendees of the Nation of Islam ("NOI") religious service at Red Onion State Prison ("Red Onion") on February 3, 2017, another inmate punched him in the face.  Officers took Roscoe to segregation without providing medical care despite his insistence that he had suffered a broken jaw.  Later, he was transported to the Red Onion medical unit and then to a local hospital's emergency department.  A CT scan confirmed that his jaw was broken, and the ER doctor recommended Percocet for pain relief.  Back at Red Onion, Roscoe spent three days in the medical unit, where he received allegedly insufficient pain medication and nothing to stabilize his jaw.

On February 6, 2017, an outside physician, Dr. Hollyfield, performed oral surgery on Roscoe and wired his jaws shut to facilitate healing.  Many times in the following weeks, Roscoe's meals were not liquid enough for him to eat with his jaws wired shut, contrary to medical diet orders.

Based on events at the NOI service on February 3, 2017, an officer who was monitoring the meeting charged Roscoe with a disciplinary infraction for fighting. The hearing officer found him guilty and fined him.

Dr. Hollyfield removed the wires from Roscoe's jaw on March 2, 2017, and put in metal braces bound by rubber bands. Roscoe continued to seek dental care for complains of pain and difficulty eating. In June of 2017, transportation officers refused to transport Roscoe to an off-site medical appointment, based on their reports that he was disruptive and threatened to harm them. That appointment was not rescheduled until September of 2017.

Roscoe filed his § 1983 action in October of 2017, suing multiple defendants and claiming denial of adequate dental care and food he could eat and denial of due process during the disciplinary proceedings. He alleged ongoing issues with pain while brushing his teeth and eating. He stated that his jaws were misaligned, causing speech difficulties and pain that interfered with his sleep and his ability to hear. As of September of 2017, Roscoe was allegedly unable to eat regular prison meals, was not being provided the soft diet ordered for him and was waiting for a follow up appointment at the Medical College of Virginia ("MCV").

In January of 2018, after many of the defendants had waived service of process in this case, Roscoe filed a motion seeking interlocutory injunctive relief. He asked the court to order the defendants to provide him with appropriate dental treatment and a soft diet, to stop retaliating against him for this lawsuit, and to transfer him to another prison. The presiding judge, Senior United States District Judge Jackson L. Kiser, referred the case to United States Magistrate Judge Pamela

Meade Sargent, who conducted an evidentiary hearing on March 1, 2018. Based on the testimony presented and the record, Judge Sargent issued a Report and Recommendation ("R&R"), recommending that the court grant in part Roscoe's request for interlocutory injunctive relief. On June 26, 2018, Judge Kiser overruled the parties' objections, adopted the R&R, and ordered Dr. Moore,[1] in his official capacity as the Red Onion dentist, to arrange for Roscoe to be evaluated by an oral surgeon within thirty days for his complaints of continued pain and inability to chew food. Roscoe saw an oral surgeon on July 11, 2018, who prescribed physical therapy and other measures.[2]

During the March 1, 2018, evidentiary hearing, Roscoe questioned R. Hubbard,[3] a dental assistant at Red Onion, about a request Roscoe filed in November of 2017, asking to see the dentist about ongoing pain and difficulty eating his food. Hubbard treated the request as a nonemergency and scheduled Roscoe for a routine dental exam that did not occur until December 28, 2017. Hubbard also testified that

---

[1] Roscoe sometimes refers to this defendant as Dr. Morre.

[2] Roscoe later filed motions for interlocutory injunctive relief, among other things complaining that he did not receive all of these recommended treatment measures. Judge Sargent issued a R&R on March 19, 2019, finding that Roscoe had not presented sufficient evidence to justify interlocutory relief. She reported evidence that Roscoe has had follow up care by specialists, who have found that his mandible fracture has healed well, but who disagree about the proper course of treatment for his continuing complaints of paresthesia and discomfort. I adopted the R&R and denied Roscoe's motions for interlocutory relief.

[3] The Complaint refers to this defendant as Jane Doe #1.

after receiving another request from Roscoe, dated January 8, 2018, she said she had scheduled him for a dental exam as requested, but did not actually do so. She explained that Dr. Moore then relayed to her instructions from Dr. Wyatt, chief dentist for the Virginia Department of Corrections ("VDOC"), to provide care to Roscoe only in an "emergency situation" until his lawsuits against the dental department were resolved. Tr. 105, ECF No. 225. Judge Sargent granted Roscoe's request to file a second amended pleading[4] to add a claim that Dr. Wyatt retaliated against Roscoe for filing this lawsuit by ordering Moore and Hubbard to deny him care. *Id.* at 332-35. Roscoe filed his amended pleading in early May of 2018.

In response to Roscoe's current Complaint, Dr. Moore and Nurse Bledsoe filed a Motion to Dismiss and attached Dr. Moore's declaration, a transcript excerpt of Bledsoe's evidentiary hearing testimony, and medical records. Hubbard, P. Adams[5] (a medical staff employee at Red Onion), and Dr. Wyatt filed Motions to Dismiss. Other defendants filed only Answers.

Judge Sargent issued a R&R on November 9, 2018, addressing these motions. Because evidence outside the pleadings had been presented to the court, pursuant to Rule 12(d), Judge Sargent considered all of the motions under Rule 56 of the Federal

---

[4] Roscoe's first motion for leave to file an amended pleading was dismissed without prejudice.

[5] Roscoe's prior complaints referred to this defendant as Jane Doe #2.

Rules of Civil Procedure.  She recommended granting summary judgment as to some claims and denying summary judgment as to Roscoe's claims of deliberate indifference to serious medical needs by Dr. Moore, Hubbard, and Dr. Wyatt, and as to his retaliation claim against Dr. Wyatt.  These claims are related to the alleged denial or delay of dental care for Roscoe, starting in late 2017, because of Dr. Wyatt's direction to treat him only in emergencies until his litigation against dental personnel ended.  Hubbard and Dr. Wyatt did not file any objections to Judge Sargent's R&R.

On February 19, 2019, Judge Kiser adopted the R&R and granted summary judgment on all claims against Adams and Bledsoe and some claims against Dr. Moore.  Judge Kiser denied summary judgment as to Roscoe's claims of deliberate indifference in late 2017 and early 2018 by Dr. Moore, Hubbard, and Dr. Wyatt, and as to his retaliation claim against Dr. Wyatt.  Judge Kiser directed the clerk to set these remaining claims for a jury trial and transferred the case to me for further proceedings.

In the meantime, the defendants have filed other motions that must be addressed before I can conduct a trial.  The motions for summary judgment now before me address the following claims alleged in Roscoe's Complaint:

(1)     Defendants Collins, Bentley,[6] Sellers, and Sowards were deliberately indifferent to Roscoe's serious medical needs after the assault on

---

[6] The Complaint also refers to this defendant as Bently.

February 3, 2017, when they did not provide him access to immediate medical care;

(2)    Dr. Boakye, a physician at Red Onion, was deliberately indifferent to Roscoe's serious medical needs when he chose (a) not to transfer Roscoe to another facility on February 3, 2017, and (b) to prescribe Tylenol No. 3 with codeine rather than Percocet;

(3)    Defendants Scarberry and Brock were deliberately indifferent to Roscoe's serious medical needs when they failed to ensure that he received food that he could eat in the weeks after his jaw was broken;

(4)    Defendants Bray, Farmer, Meade,[7] Large, and Sykes were deliberately indifferent to Roscoe's serious medical needs when they cancelled his transportation for a follow-up appointment with the oral surgeon in June of 2017;

(5)    Defendants Hubbard, in late 2017 and early 2018, and Dr. Wyatt, in early 2018, were deliberately indifferent to Roscoe's serious medical needs delaying nonemergency appointments to assess his ongoing dental complaints;

(6)    Dr. Wyatt retaliated against Roscoe for filing lawsuits by directing the dental staff to stop providing him with nonemergency dental care until the litigation ended; and

(7)    Defendants Payne,[8] Sexton, and Mullins denied Roscoe due process during disciplinary proceedings after he was charged with fighting another inmate on February 3, 2017.[9]

---

[7] This defendant is sometimes referred to in the record as Head or Mead.

[8] This defendant is sometimes referred to in the record as Pain or Childress.

[9] Roscoe voluntarily dismissed his claim that defendants Payne and Sexton failed to protect him from the assault on February 3, 2017, in violation of his Eighth Amendment rights. *See* Order, ECF No. 227.

Defendants Collins, Bentley, Sellers, Sowards, Scarberry, Brock, Bray, Farmer, Meade, Large, Sykes, Dr. Wyatt, Hubbard, Payne, Sexton, and Mullins move for summary judgment, arguing that Roscoe failed to exhaust administrative remedies before filing his claims against these defendants and, in the alternative, that they are entitled to summary judgment on the merits of the claims. Dr. Boakye moves for summary judgment, arguing that Roscoe failed to exhaust administrative remedies and that no reasonable jury could find that he was deliberately indifferent to Roscoe's medical needs. Roscoe has responded to both of these motions, making them ripe for consideration.

## II. DISCUSSION.

### A. The Summary Judgment Standard.

A court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

> In considering a motion for summary judgment, the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party. The plaintiff is entitled to have the credibility of all his evidence presumed. The party seeking summary judgment has the initial burden to show absence of evidence to support the nonmoving party's case. The opposing party must demonstrate that a triable issue of fact exists; he may not rest upon mere allegations or denials. A mere scintilla of evidence supporting the case is insufficient.

*Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994).[10]

The defendants have filed supporting affidavits and documentation. Accordingly, to avoid summary judgment, Roscoe must present sufficient evidence that could carry the burden of proof of his claims at trial. *See id.* He "may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine [factual] issue for trial" on which the jury could find in his favor. *Anderson*, 477 U.S. at 248.

A pro se litigant's verified complaint must be considered as an affidavit and may, standing alone, defeat a motion for summary judgment when the allegations contained therein are based on personal knowledge. *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991). "[U]nsupported speculation is not sufficient to defeat a summary judgment motion," however. *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 875 (4th Cir. 1992).

## B. Exhaustion of Administrative Remedies.

A prisoner cannot bring a civil action concerning prison conditions until he has first exhausted available administrative remedies. 42 U.S.C. § 1997e(a). This exhaustion requirement is "mandatory." *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016). To comply with § 1997e(a), an inmate must follow each step of the

---

[10] I have omitted internal citations, quotation marks, and/or alterations here and throughout this Opinion, unless otherwise noted.

established grievance procedure available at the facility before filing his civil action. *See Woodford v. Ngo*, 548 U.S. 81, 90-94 (2006). The defendants bear the burden of proving the affirmative defense that Roscoe failed to exhaust available administrative remedies regarding his claims before filing suit. *Jones v. Bock*, 549 U.S. 199, 216 (2007).

Operating Procedure ("OP") 866.1 is the written administrative remedies procedure that VDOC inmates must follow to comply with § 1997e(a). Mem. Supp. Mot. Summ. J. Ex. 1, Adams Aff., Enclosure A, ECF No. 214-1. All issues are grievable except those pertaining to the policies, procedures, and decisions of the Virginia Parole Board, disciplinary hearings, state and federal court decisions, laws and regulations, and other matters beyond the control of the VDOC.

Under this procedure, an inmate with a grievance about some event or issue must first make a good faith effort to resolve his concerns informally, verbally and then in writing on an informal complaint form. When an inmate's informal complaint is filed, he should receive a receipt and within fifteen calendar days, he should also receive a written response to the issue he has raised. If he does not receive a response within fifteen days, he may file a regular grievance on the issue and attach the informal complaint receipt as documentation of his attempt to resolve the issue informally.

The inmate must file a regular grievance within thirty days of the occurrence about which it complains. A regular grievance that does not meet the filing requirements of OP 866.1 will be returned to the inmate within two working days with a note on the back of the form, stating the reason for rejection and instructions on how to remedy the problem and refile where feasible. The inmate may appeal the intake rejection by sending the regular grievance to the regional ombudsman within five calendar days. An appeal of the intake decision does not satisfy the requirements of exhaustion of a regular grievance, however.

A properly filed regular grievance will trigger an investigation, on which the warden or his designee will send the inmate a Level I response. If the responding official determines the grievance to be "unfounded," to exhaust available remedies, the inmate must appeal that holding to Level II, and in some cases, to Level III.

The defendants have presented evidence that Red Onion grievance department records do not indicate that Roscoe completed all steps of the OP 866.1 procedures as to any of the issues raised in his current Complaint, except his due process claims, which are not grievable. An inmate may escape summary judgment under § 1997e(a), however, if he states facts showing that the remedies under the established grievance procedure were not "available" to him. *Ross*, 136 S. Ct. at 1859. Generally, "an administrative remedy is not considered to have been available if a

prisoner, through no fault of his own, was prevented from availing himself of it."
*Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008).

Long before the defendants' current motions were filed, Roscoe submitted evidence of his efforts and frustrations while attempting to exhaust administrative remedies about all of his claims in the Complaint. Roscoe Aff., ECF No. 154. I conclude that this evidence presents genuine issues of material facts on which Roscoe could persuade a reasonable fact finder that he tried to exhaust administrative remedies, but he was prevented, through no fault of his own, from following all the steps of the VDOC grievance procedures as to the grievable issues he raises in this lawsuit.[11] Accordingly, I cannot find that any of the defendants is entitled to

---

[11] Dr. Boakye argues that Roscoe's claims against him should be barred under § 1997e(a) because none of the administrative remedies Roscoe filed named Dr. Boakye or directly targeted the challenge he raises concerning Dr. Boakye's actions in the first three days after the jaw injury. I cannot agree.

In *Jones v. Bock*, 549 U.S. 199, 218 (2007), the Supreme Court of the United States rejected a court-imposed procedure providing that exhaustion under § 1997e(a) was not satisfied unless the inmate had identified in his grievances each person later named as a defendant in his lawsuit. The Court held that § 1997e(a) requires an inmate to

> complete the administrative review process in accordance with the applicable procedural rules, — rules that are defined not by [§ 1997e(a)], but by the prison grievance process itself. Compliance with prison grievance procedures, therefore, is all that is required . . . to properly exhaust. The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not [§ 1997e(a)], that define the boundaries of proper exhaustion.

summary judgment as a matter of law on the ground that Roscoe failed to exhaust administrative remedies before filing the claims in his current Complaint.

## C.  Eighth Amendment Medical Claims.

To state a claim under § 1983, a plaintiff must allege "the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).  To hold an official liable under § 1983, the plaintiff must state facts to affirmatively show that the officer acted personally to deprive the plaintiff of, or violate his, constitutional rights.  *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977).

An inmate's Eighth Amendment protections against cruel and unusual punishment include a right to the medical care necessary to address his serious medical needs.  *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976).  Specifically, a prison

---

*Id.*  The VDOC grievance procedures do not include a provision requiring that a grievance must name all participants in an incident or issue being grieved.  Thus, for VDOC inmates, "exhaustion is not *per se* inadequate simply because an individual later sued was not named in the grievances."  *Id.* at 219.

In this case, the administrative remedy forms and appeals that Roscoe filed about his medical and dental care at Red Onion described his condition and the reasons for his dissatisfaction with treatment.  His dissatisfaction with his care during the first three days after the injury and with his pain medication was clearly expressed in the remedy forms he filed, and these are the issues for which he sues Dr. Boakye.  While the remedy forms do not name each of the defendants Roscoe has sued, that omission is not per se improper exhaustion under the VDOC's procedures.  Accordingly, I cannot grant Dr. Boakye's motion for summary judgment on exhaustion grounds.

official's "deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment under the Eighth Amendment." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014).

The medical need portion of this legal standard is objective. It requires showing that the inmate's medical condition is "serious — one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* The other, deliberate indifference portion of the standard is subjective. The plaintiff must show that each defendant knew of and disregarded an excessive risk to inmate safety or health. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). It is not sufficient to show that an official should have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk of harm posed by the official's action or inaction. *Jackson*, 775 F.3d at 178. "This deliberate indifference standard is not satisfied by a showing of mere negligence, a mere error of judgment or inadvertent failure to provide medical care, or mere disagreement concerning questions of medical judgment." *Germain v. Shearin*, 531 F. App'x 392, 395 (4th Cir. 2013) (unpublished); *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977) ("[T]he essential test is one of medical necessity and not simply that which may be considered merely desirable").

1. Delay of Care by Collins, Bentley, Sellers, and Sowards.

After the inmate assaulted Roscoe on February 3, 2017, Roscoe alleges that he passed out. When he regained consciousness, he believed his jaw was broken and tried to communicate to Unit Manager Collins that he needed medical treatment. Collins directed Bentley and another officer to escort Roscoe to a segregation cell without stopping at the medical unit on the way. Collins said that if something was wrong with Roscoe, he could file a sick call request and pay the five-dollar copay to see medical assistance. On the way to segregation, Roscoe started spitting up blood and told the officers his jaw was broken and needed immediate medical attention. The officers followed Collins' directions not to take Roscoe to the medical unit.

Once inside his segregation cell, Roscoe stopped Officer Sellers as she conducted security rounds and asked for medical attention. Sellers relied on Collins' statement that Roscoe looked fine and did not need to go immediately to the medical unit. When Officer Sowards[12] came by on a security round, Roscoe told him that his jaw was broken, and his teeth were moving. Sowards told him to file a sick call request. Thereafter, Roscoe lost consciousness. He was awakened by nurses banging on his cell door. They directed security officers to get Roscoe out of his cell. He was later escorted to the medical unit, where he was evaluated by Dr. Moore

---

[12] In Roscoe's First Amended Complaint, ECF No. 59, at ¶ 55-56, he brings these allegations against Officer Sowards. In the current Complaint, however, he refers to this defendant as John Doe #2. *See* Compl. ¶¶ 55-56, ECF No. 86.

and Dr. Boakye, a Red Onion physician, who sent him on to the emergency room ("ER").

In response to Roscoe's allegations, the defendants offer evidence that the altercation between Roscoe and the other inmate occurred around 9:40 a.m. on a Friday. As a unit manager, Collins states that unless an offender is obviously in need of immediate medical attention after an inmate altercation, prison security concerns dictate that it is safer to place him in a segregation cell and have him medically assessed there. Once Roscoe and his attacker were in their segregation cells, Collins "ensured that the medical department [was] contacted" and that both inmates "were then assessed by medical staff in the segregation housing unit." Mem. Supp. Mot. Summ. J. Ex. 4, Collins Aff. ¶ 7, ECF No. 214-4. Collins denies that he ever commented that Roscoe looked fine and could wait and pay for a sick call visit. On the contrary, A4 housing unit logbook entries attached to Collins' affidavit indicate that Roscoe was placed in his segregation cell at 9:45 a.m., and nurses entered the housing unit fifteen minutes later, at 10:00 a.m., to evaluate Roscoe's medical needs. They noted that Roscoe had "swelling on both sides of his lower jaw and bleeding from his mouth," and that he told a nurse "that his teeth felt loose." *Id* at ¶ 8. Roscoe was then escorted to the medical department.

By 11:30 a.m., Dr. Moore and Dr. Boakye examined Roscoe.[13]  Roscoe complained of blood in his mouth, problems opening his mouth widely because of pain, and difficulty speaking.  Dr. Boakye's impression was that "Roscoe had suffered facial trauma and should be referred to the [ER] to rule out zygomatic maxillary, and mandibular fracture."  Mem. Supp. Mot. Summ. J. Ex. A, Boakye Aff. ¶ 10, ECF No. 180-1.  In the meantime, Dr. Boakye prescribed Roscoe 1 gram of Tylenol and 600 mg of ibuprofen for pain.

Roscoe argues that immediately after the assault, Collins, Bentley, Sellers, and Sowers must have known by looking that his jaw was broken, he was bleeding, and he needed immediate medical attention, but they disregarded these risks to his health and safety and did not allow him immediate access to medical care.  While a broken jaw presents a serious medical need, I find no evidence that these defendants knew that refusing Roscoe medical attention in the gym or at the medical unit on the way to the segregation unit created an excessive risk of serious physical harm.  *Jackson*, 775 F.3d at 178.  It is undisputed that Collins had safety reasons to remove Roscoe from the gym to segregation and knew that medical staff would assess him

---

[13]  The doctors' affidavits make reference to attached copies of Roscoe's prison medical records, kept in the normal course of business.

within minutes after he reached his segregation cell. The other officers reasonably relied on their ranking officer's orders.[14]

Roscoe believes that these defendants purposely delayed his treatment nearly two hours, but he offers no evidence to support this belief, other than the short distance between segregation and the medical unit. Logbook entries indicate after Roscoe arrived in segregation at 9:45 a.m., Sellers made a security check at 9:49, and nurses arrived at 10:00. True, Dr. Boakye and Dr. Moore did not examine Roscoe in the medical unit until 11:30. Between 10:00 a.m. and 11:30, however, officers removed Roscoe from his segregation cell, the nurses conducted their assessment, and Roscoe was moved to the medical unit for the doctors to see him. Then, the doctors sent him to the ER, not to receive emergency treatment or pain relief, but to undergo imaging to confirm their diagnosis that his jaw was broken. Roscoe has presented no disputed fact on which he could prove that Collins, Bentley, Sellers, or Sowers knew he needed quicker or different medical attention than he received that morning. Moreover, after 10:00 a.m., the officers rightfully relied on the nurses to determine the appropriate course of care and its timing. *See Shakka v.*

_____

[14] Roscoe claims that the officers told him he would have to make a sick call request to receive medical care and be subject to a copay charge. Clearly, even if such comments occurred, they were empty threats, as Roscoe received a medical evaluation minutes after the assault and assessment by the physician and the dentist within less than two hours. Allegations of verbal abuse and harassment by guards, without more, do not state any constitutional claim. *Henslee v. Lewis*, 153 Fed. App'x 178, 180 (4th Cir. 2005) (unpublished) (citing *Collins v. Cundy*, 603 F.2d 825, 827 (10th Cir. 1979)).

*Smith*, 71 F.3d 162, 167 (4th Cir. 1995).  I conclude that Collins, Bentley, Sellers, and Sowers are entitled to summary judgment on Roscoe's claim against them.

### 2.  Medical Care by Dr. Boakye.

Roscoe faults Dr. Boakye, a Red Onion physician, for failing to refer him immediately to an oral surgeon on February 3, 2017, after he returned from the ER, and for failing to provide Percocet in the days thereafter, as recommended by the ER doctor and the oral surgeon on February 6, 2017.  Roscoe alleges that these decisions by Dr. Boakye represent deliberate indifference to the severe pain he suffered for three days with no treatment, waiting to see the oral surgeon.

This defendant's evidence soundly refutes Roscoe's allegations that he needed emergency care by an oral surgeon and that he did not receive any treatment over the weekend waiting to see such a surgeon.  The CT image indicated that Roscoe had "(a) a comminuted and slightly displaced fracture involving the left angle of the mandible with a large hematoma containing air; and (b) a comminuted and slightly displaced fracture involving the body of the mandible anteriorly, slightly to the right of the midline.  In other words, Roscoe's jaw was fractured."  Boakye Aff. ¶ 12, ECF No. 180-1.  In addition to the CT results, Dr. Boakye reviewed the report from Dr. Cox, the ER physician who had examined Roscoe.  Dr. Cox reported that Roscoe received a 4 mg injection of morphine at the ER.  Going forward, Dr. Cox

recommended "Percocet 10/325" every six hours, clear liquids only, and a follow-up with an oral surgeon.[15]  *Id.* at ¶¶ 13–14.

Dr. Boakye then contacted the attending physician for oral surgery at MCV, reported his impression of Roscoe's injury and the findings of the CT images, in order to determine whether his condition required emergency care and transfer to MCV for treatment that same day.  The MCV oral surgeon advised Dr. Boakye that Roscoe's condition did not require emergency treatment or immediate transfer to MCV.  He recommended a follow up appointment at MCV the next week and no chewing in the meantime.  Dr. Moore had already scheduled Roscoe for an appointment with Dr. Hollyfield on February 6, 2017.

After Roscoe returned to Red Onion on February 3, 2017, Dr. Boakye examined him at approximately 3:15 p.m.  Instead of Percocet, Dr. Boakye prescribed Roscoe Tylenol No. 3 with codeine in a dosage comparable to the dose of Percocet that Dr. Cox had recommended.  Dr. Boakye states that "Percocet is a narcotic medication that is not in the formulary at [Red Onion]"— a list of medications that VDOC facilities keep in their regular supplies and that a VDOC

---

[15]   The report from Dr. Cox after the ER visit mentions the recommendation for follow up with an oral surgeon three times:  once merely recommending a follow up, and twice as scheduled appointments as needed.

physician may prescribe without preapproval from a supervisor.[16]  Boakye Aff. at ¶ 20, ECF No. 180-1.  He states that "[b]ased on [his] education and experience, the dosage of Tylenol No. 3 with codeine that [he] prescribed for Roscoe was comparable to the Percocet dose recommended by Dr. Cox and an appropriate substitution for Dr. Cox's recommendation."  *Id.* at ¶ 24.

In addition to the pain medication, Dr. Boakye ordered the following additional treatment measures:  (1) check his vitals every shift, apply ice packs to the left jaw for twenty minutes every four hours for three days; (2) one can of Boost nutritional supplement, three times daily; (3) Colace every day for thirty days; (4) Senna every evening for fourteen days, (5) Amoxil two times daily for five days; (6) gargling warm saline every four hours while awake for five days; and (7) Peridex mouth rinse after meals for ten days.  When Dr. Boakye checked on Roscoe the day after the injury, he added a prescription of Motrin 600 three times daily for five days, for pain control, thus increasing his pain management regimen beyond that originally recommended by Dr. Cox.

---

[16]  Dr. Boakye explains that Percocet is a combination drug typically used to relieve moderate and severe pain, containing an opioid pain reliever (oxycodone) and a non-opioid pain reliever (acetaminophen).  Dr. Cox's recommended dosage, Percocet 10/325, represents 10 mg of oxycodone and 325 mg of acetaminophen.  Similarly, the medication that Dr. Boakye prescribed to Roscoe, is a combination of an opioid pain reliever (codeine) and a non-opioid pain reliever (acetaminophen).  Tylenol No. 3 with codeine (30/500) contains 30 mg of codeine and 500 mg of acetaminophen.

On February 5, 2017, medical staff monitored Roscoe several times, noting that he managed a stable gait to the cell door, his breathing was unlabored and even, the swelling in his face had decreased some, and he was oriented to person, place and time. That evening, staff noted no complaints and no acute distress. The next day, staff noted similar symptoms in observing Roscoe. At 6:00 a.m., he complained that his pain medications were not helping, but he accepted them. Nurses noted that by 7:45 a.m., he voiced no complaints and no acute distress.

On February 6, 2017, medical staff recorded at 5:15 a.m. that Roscoe was lying on his bunk, his breathing even and unlabored. At 6:00, he complained that his pain medications were not helping, but accepted them. By 7:45, staff noted that he voiced no complaints, was alert and oriented, and in no acute distress. After Roscoe returned from the off-site visit with the oral surgeon, Dr. Hollyfield, Dr. Boakye examined him at approximately 3:08 p.m. The doctor noted that Roscoe voiced no complaints and appeared comfortable, and his facial swelling and bruising were decreasing.

Dr. Moore also examined Roscoe on February 6, 2017. He observed that Roscoe was in no distress. At 6:40 a.m. on February 7, 2017, Hubbard asked Roscoe if he was "doing okay." *Id.* at 62. Roscoe gave a "thumbs up and nodded yes." *Id.* Asked if he needed anything, Roscoe shook his head in the negative. At 7:10 a.m.

on February 8, 2017, dental staff assessed Roscoe and noted decreased swelling and communicating well.

On February 8, 2017, Dr. Moore and Dr. Boakye discussed Roscoe's pain management. Based on medical training and experience, Dr. Boakye believed that the prescribed dosages of Tylenol No. 3 with codeine and Motrin were sufficient. That same day, Dr. Moore changed the prescription for Boost to two boxes, three times a day, for thirty days at 7:00 a.m., noon, and 9:00 p.m. No later than February 15, 2017, Dr. Moore assumed responsibility for treatment of Roscoe's jaw injury and for the monitoring and prescribing pain medication for Roscoe's pain management for his jaw injury. On February 15, 2017, Dr. Moore prescribed Roscoe Tylenol No. 3 with codeine, two pills three times a day as needed, for fourteen days, and 600 mg Advil per day as well. Medical records do not show that Dr. Boakye had any further interactions with Roscoe before the doctor transferred to another facility in mid-May 2017.

On this record, I cannot find that Dr. Boakye was deliberately indifferent to Roscoe's medical needs regarding the timing of his appointment with the oral surgeon. Roscoe's Complaint alleges that he went for three days with a broken jaw and no medical treatment. The evidence is clearly not consistent with this story. On the contrary, Dr. Boakye prescribed pain medication for Roscoe even before he went to the ER and extensive treatment measures upon his return to address pain and

dietary needs. The doctor consulted with the oral surgeon and reported to him the results of the CT study. The oral surgeon, not Dr. Boakye, determined that Roscoe's condition could wait for surgical intervention until the following week. Roscoe now claims, with no factual support, that the doctor misrepresented to the oral surgeon the extent of the injury[17] and the level of treatment available in the Red Onion medical department, and that the doctor should have faxed the CT results to the surgeon. Such disagreements between doctor and patient about the proper course of treatment do not rise to the level of deliberate indifference to an excessive risk of harm, particularly here, where they are based only on Roscoe's self-serving speculation about the doctor's actions. *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985).

I reach the same conclusion as to Dr. Boakye's choice of pain medication for Roscoe. While Dr. Boakye is not an oral surgeon, as part of his "medical training and experience, [he] ha[s] knowledge regarding the selection and prescription of medications for purposes of pain management." Boakye Aff. ¶ 5, ECF No. 180-1. The doctor has expressed his medical judgment that Tylenol No. 3 with codeine was

---

[17] Roscoe focuses this argument on the note from Dr. Cox in the ER report to "Schedule an appointment with oral surgeon as soon as possible for a visit *today*. . . . As needed." (emphasis added). Boakye Aff. Encl. A-2, at 38, ECF No. 180-1. Dr. Boakye followed the advice of the oral surgeon as to the timing of Roscoe's surgical appointment, instead of construing the ER doctor's note as an indication that the jaw injury required more immediate surgical intervention. Such disagreements over medical judgments are not the province of this court in a § 1983 action.

an appropriate substitution for Percocet, which would have been available for Roscoe only after a possible delay to seek preapproval and fill a prescription. The day after the injury, Dr. Boakye added Motrin, thus providing Roscoe more pain medication than Dr. Cox recommended. On February 8, 2017, after Dr. Boakye and Dr. Moore consulted about pain management for Roscoe, Dr. Boakye continued to believe that the dosages he had prescribed of Tylenol No. 3 with codeine and Motrin were sufficient.

Roscoe continues to contend that Percocet would better have controlled his pain, based merely on the fact that other doctors, who had no knowledge of the VDOC medication formulary, recommended Percocet. Such doctor-patient differences over whether "additional, stronger, or more frequent pain medication was required . . . is insufficient to prevail on a deliberate indifference claim." *Drakeford v. Mullins*, 678 F. App'x 185, 186 (4th Cir. 2017) (unpublished). Such questions over medical judgments "are not subject to judicial review." *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975). Medical decisions to select one treatment over another are simply "'beyond the [Eighth] Amendment's purview.'" *Brembry v. United States*, No. 7:10-CV-388, 2011 WL 121741, at *11 (W.D. Va. Jan. 13, 2011). Finding no genuine issue of material fact on which Roscoe could persuade a fact finder that Dr. Boakye was deliberately indifferent to his serious medical needs in February of 2017, I will grant the doctor's motion for summary judgment.

3. Food Service by Scarberry and Brock.

In Roscoe's third claim, he contends that these defendants, who work in food service at Red Onion, failed to ensure that his medically prescribed diet was properly prepared for consumption by a man with a broken jaw. Roscoe alleges that from February 3 to 10, 2017, he had a medical order for a liquid diet, but meals delivered during this period frequently were not liquid enough to pull through a straw. On February 10, 2017, Dr. Moore met with Brock and Roscoe, who wrote on a tablet that he had often been unable to eat the food provided to him in the preceding days. Roscoe alleges that he could consume the meals on February 10 and 11, 2017, but for days thereafter, he could not, because the food was not properly prepared to pull through a straw. Roscoe claims that on February 7-9, 2017, and February 12 to March 13, 2017, he could not consume the majority of his meals, and his weight dropped from 142 pounds to 123 pounds.

Brock and Scarberry offer evidence that on February 6, 2017, the food service staff received a medical order that Roscoe should receive a "clear liquid diet" with a Boost liquid nutritional drink as a supplement. Mem. Supp. Mot. Summ. J. Ex. 2, Scarberry Aff. ¶ 4, ECF No. 214-2; Ex. 3, Brock Aff. ¶ 4, ECF No. 214-3. The medical department, not food service, issues medical diet orders and provides the nutritional drinks to be served with meals. On February 10, 2017, Roscoe's medical diet order was changed to a "mechanical soft diet" with the Boost supplements.

Scarberry Aff. Enclosure A, ECF No. 214-2. That day, Brock met with Dr. Moore and Roscoe to discuss the inmate's dietary needs. On March 2, 2017, Roscoe's diet order changed back to a "full liquid" diet. *Id.* On March 13, 2017, Scarberry received an informal complaint from Roscoe complaining about being unable to eat many of his meals over the preceding days. She advised him to contact the medical staff about his medical diet order, which she had no authority to change.

Brock and Scarberry are supervisory officials. They do not personally prepare the inmates' meals. They both state that between February 3 and March 13, 2017, other than the discussion with him on February 10, 2017, they received no complaints from Roscoe about his meals. Furthermore, they both state that to the best of their knowledge, the meals provided to Roscoe during that time were prepared according to the medical department's orders for Roscoe's medical needs.

I will presume that Roscoe, with his jaws wired shut, had an obviously serious medical need for nutritious food that he could consume in that condition. *Jackson*, 775 F.3d at 178. To prevail on his Eighth Amendment claim against these defendants, however, he must also show that each defendant had actual subjective knowledge of the excessive risk posed by the official's action or inaction. *Id.* A defendant's allegedly negligent interference with an inmate's prescribed medical treatment is not deliberate indifference. *Germain*, 531 F. App'x at 395.

Roscoe simply has not made these showings. He offers no evidence that his nineteen-pound weight loss caused him serious physical harm or threatened his overall health. He admits that after Brock and Dr. Moore met with him about his diet needs on February 20, 2017, the following two days he could consume the meals provided. Yet, he provides no evidence that he communicated directly to either of these defendants about later meals he could not eat until mid-March of 2017, after the time period at issue in his Complaint. To the extent that he faults Brock and Scarberry for improperly supervising preparation of the meals medically prescribed for him, he has alleged nothing more than negligence, which cannot support a deliberate indifference claim. *See Cty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998) ("[T]he Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold" of constitutional protections). Accordingly, I will grant summary judgment for Brock and Scarberry.

4. Deliberate Indifference by Bray, Farmer, Meade, Large, and Sykes.

Roscoe asserts that for illegitimate reasons, these defendants denied him a scheduled follow up appointment with the oral surgeon on June 21, 2017. He alleges that although he had undergone a visual strip search when leaving his cell that morning to be transported to the appointment, Large, Meade, Bray, and Farmer ordered him to comply with another strip search in the receiving department. Meade

yelled, "Open your F***ing mouth," and when Roscoe complied, Meade yelled the same instruction again.  Compl. ¶ 122, ECF No. 86.  Then, Meade allegedly poked his finger at the cell door window, stating, "Ni***r ya Riding with the Right ones today[.]  I carry the guns now so Boy you either sh** that attitude in the to[il]et over there . . . or Black lives won[']t Matter today you understand me Ni***r."  *Id*. at ¶ 123.

Large allegedly told Roscoe that no cameras would record what happened to him there, and if he got shot, the officers would just say that he tried to escape.  According to Roscoe, Meade then threatened to kill him, and Roscoe asked Farmer and Large, with tears in his eyes, if they were going to let Meade threaten him.  Large slammed the tray slot closed and called for clearance to mace Roscoe "for no reason."  *Id.* at ¶ 125.  Then, Large allegedly told Meade to write "a false charge of threatening bodily harm."  *Id.*  The officers notified Sykes, who told them not to take Roscoe to his medical appointment.  The record indicates that Roscoe was later found guilty of the threat charge.  He does not raise any due process claim related to this infraction, however, and brings his claim against Meade, Farmer, Large, Bray, and Sykes only under the Eighth Amendment, alleging that they were deliberately indifferent to his serious medical needs.  *See id.* at ¶ 130-31.

The defendants' version of events differs markedly from Roscoe's account.  Bray states that during the strip search in the receiving area, "Roscoe was very irate

towards staff" and "was yelling and cursing staying, 'it was too early for this stupid sh**.'" Mem. Supp. Mot. Summ. J. Ex. 5, Bray Aff. ¶ 4, ECF No. 214-5. According to Bray, Roscoe removed his clothes as the officers had ordered, saying, "I'll do your stupid strip search, but when we get on the road, I will get your ass." *Id.* Meade notified Lieutenant Sykes of Roscoe's statement and told Sykes that "Roscoe had been verbally disruptive." *Id.* Sykes informed Lieutenant Lambert of this information, and Lambert ordered that "Roscoe's transportation be cancelled and scheduled for another day." *Id.* at Ex. 9, Sykes Aff. ¶ 4, ECF No. 214-9. Bray states that if he had known Roscoe needed immediate medical care on June 21, 2017, he would have ensured that medical staff assessed him after his appointment was cancelled.

To prevail on his claim against these defendants, Roscoe must show (a) that he had an obviously serious medical need to attend the June 21, 2017, follow up appointment and (b) that each defendant had actual subjective knowledge of the excessive risk posed by the official's inactions. *Jackson*, 775 F.3d at 178. Roscoe simply has not made any such showing. It is undisputed that by June 21, 2017, his jaw fracture had healed and was no longer wired shut. He does not allege that he had any visibly obvious medical need for immediate treatment that day or that he told the transportation officers of the reasons for the appointment. Even assuming the officers knew that the appointment was a follow up with the oral surgeon, this

knowledge alone did not put them on notice that cancelling the appointment would create an excessive risk that Roscoe would be denied medically necessary care or suffer serious harm. Roscoe also presents no evidence that these officers knew that the cancellation would delay a rescheduled appointment until September of 2017.

Bray denies hearing Meade or Large make the comments Roscoe has described. Meade and Large failed to submit signed affidavits in support of the summary judgment motion. The alleged comments are deplorable and unprofessional, at the very least. Even if Roscoe could convince a jury that the officers actually said these things, however, the words alone do not rise to the level of a constitutional violation. *See Henslee*, 153 Fed. App'x at 180 (citing *Collins v. Cundy*, 603 F.2d 825, 827 (10th Cir. 1979)). For reasons stated, I conclude that Roscoe presents no issue of disputed material fact on which he could persuade a jury that these defendants' actions on June 21, 2017, violated his Eighth Amendment rights as he has claimed. Therefore, I will grant summary judgment for Bray, Farmer, Meade, Large, and Sykes.

### 5. Claims against Hubbard and Dr. Wyatt.

Roscoe contends that Dr. Wyatt retaliated against him by ordering the dental staff at Red Onion to delay nonemergency care until his litigation against them concluded and that Dr. Wyatt and Hubbard, in making or following that order, were deliberately indifferent to his serious medical needs for treatment of post-surgical

dental problems in late 2017 and early 2018. As discussed, Judge Kiser previously denied summary judgment for these defendants and ordered that these claims to be scheduled for trial.

Dr. Wyatt and Hubbard ask for leave to have their current motion considered as a Second Motion for Summary Judgment, supported by an affidavit from Dr. Wyatt. That affidavit was not signed, however, and has been stricken from the record. The attached VDOC operating procedure on dental care for inmates does not include or discuss the policy at issue here, which restricts a defendant dental provider from administering nonemergency dental care to a plaintiff inmate until his litigation is concluded. The defendants here also refer to Hubbard's testimony before Judge Sargent, on which Judge Kiser already relied in denying summary judgment for these defendants. Thus, I find nothing new in the record that justifies revisiting Judge Kiser's decision. I will deny summary judgment for Dr. Wyatt and Hubbard as to Roscoe's claims of deliberate indifference, and as to his claim of retaliation by Dr. Wyatt.

6. Denial of Due Process by Payne, Sexton, and Mullins.

The Due Process Clause of the Fourteenth Amendment prohibits a state from depriving "any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. "To state a procedural due process violation, a plaintiff must (1) identify a protected liberty or property interest and (2) demonstrate

deprivation of that interest without due process of law." *Prieto v. Clarke*, 780 F.3d 245, 248 (4th Cir. 2015). "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty . . . ,' or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005).

When a disciplinary penalty does not affect the length of an inmate's term of confinement, his constitutionally protected liberty interests are generally limited to freedom from restraint that imposes atypical and significant hardship on him in relation to the ordinary incidents of prison life. *See Sandin v. Conner*, 515 U.S. 472, 484 (1995) (holding that disciplinary segregation did not present the type of atypical, significant deprivation in which a state might create a liberty interest). To demonstrate a sufficient property interest, an inmate must have "an individual entitlement grounded in state law." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430 (1982).

When an inmate's disciplinary conviction subjects him to deprivation of a constitutionally protected interest, he has certain, limited rights to procedural protections:

> (1) advance written notice of the disciplinary charges; (2) an opportunity, when consistent with institutional safety and correctional goals, to call witnesses and present documentary evidence in his defense; and (3) a written statement by the factfinder of the evidence relied on and the reasons for the disciplinary action.

*Superintendent, Mass. Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 454 (1985) (citing *Wolff v. McDonnell*, 418 U.S. 539, 563–67 (1974)). If the disciplinary penalty imposed on Roscoe did not rise to the level of a constitutionally protected interest, however, then he had no federal due process right to particular procedural protections before the hearing officer imposed that penalty. *Sandin*, 515 U.S. at 484.

Sexton, Payne, and another officer were monitoring the NOI service on February 3, 2017, when an inmate punched Roscoe and broke his jaw. Roscoe contends that Sexton and Payne falsely charged him with fighting back, and Mullins, as the hearing officer, believed their testimony without properly considering other exculpatory evidence. Mullins found Roscoe guilty and imposed a fifteen- dollar fine that was deducted from the inmate's trust account.

The defendants argue that the fine imposed on Roscoe for the fighting infraction was not so atypical a deprivation as to create a protected liberty interest under *Sandin*. Roscoe argues, however, that the fine, deducted from his inmate account after an allegedly defective disciplinary hearing, constituted deprivation of his protected property interest without due process. The defendants' arguments and their cited legal authority do not address whether Roscoe had a constitutionally protected property interest that triggered federal due process requirements during the hearing.

The defendants also argue that even if Roscoe had a protected interest at stake, he received all the procedural protections required under *Wolff*. At the time they filed their summary judgment motion, however, they did not have the benefit of the decision in *Lennear v. Wilson*, 937 F.3d 257 (4th Cir. 2019). In *Lennear*, the court of appeals held that an inmate at risk of deprivation of an interest entitled to constitutional due process protections has "a qualified right to obtain and present video surveillance evidence" as documentary evidence under *Wolff*, if it does not present particularized security concerns and it aids his defense. *Id.* at 262, 273, 278. Mullins refused Roscoe's request that he review and consider the surveillance camera footage of the February 3, 2017, incident. Roscoe contends that the video footage would have bolstered his own statement at the hearing that the other inmate threw the first punch that knocked Roscoe unconscious so that he was unable to fight back. He also contends that Sexton and Payne falsely testified that Roscoe punched the attacker inmate and moved aggressively toward him so that the officers had to use mace to stop the altercation.

Based on the foregoing, I cannot find that the defendants have met their burden to show that Roscoe's evidence could not persuade a jury that his federal due process rights were violated during the disciplinary proceedings in 2017 on the charge for fighting. Accordingly, I will deny summary judgment to Mullins, Sexton, and Payne.

### III. Conclusion.

For the reasons stated, it is **ORDERED** as follows:

1.  The Motion for Summary Judgment by Dr. Boakye, ECF No. 179, is GRANTED;

2.  The Motion for Summary Judgment, ECF No. 213, is GRANTED IN PART and DENIED IN PART. The motion is DENIED as to the deliberate indifference claims against Dr. Wyatt and Hubbard, the retaliation claim against Dr. Wyatt, and the due process claims against Mullins, Sexton, and Payne and the motion is GRANTED as to all other claims against these and all other defendants;

3.  The Clerk shall terminate the following defendants as parties to the case: Collins, Bentley, Sellers, Sowards, Dr. Boakye, Scarberry, Brock, Bray, Farmer, Meade, Large, and Sykes; and

4.  The Clerk shall schedule the remaining claims against defendants Dr. Wyatt, Hubbard, Mullins, Sexton, and Payne, for a three-day jury trial in the Abingdon Division of this court.

ENTER: March 23, 2020

/s/ James P. Jones
United States District Judge